430 So.2d 265 (1983)
STATE of Louisiana in the Interest of Daphne CANADY, Deanne Canady, and Danielle Canady.
No. 82-CA-226.
Court of Appeal of Louisiana, Fifth Circuit.
April 11, 1983.
Rehearing Denied May 18, 1983.
Richard J. Brazan, Jr., Baton Rouge, for plaintiff-appellant.
Joseph E. Corte, New Orleans, for defendant-appellee.
Before CHEHARDY, CURRAULT and GRISBAUM, JJ.
*266 GRISBAUM, Judge.
An affidavit of abandonment of the minor children Daphne, Deanne, and Danielle Canady was filed against Gerald and Debra Canady by the State of Louisiana. The trial court found in favor of the parents, Gerald and Debra Canady. The issue in this case is whether subsequent to Ms. Canady's voluntary, temporary surrender of the children to the State, the circumstances show an intention to permanently avoid parental responsibility for at least four months. We affirm.
Debra Canady was awarded custody of Daphne, Deanne, and Danielle following a divorce from Gerald Canady in 1978. After evaluating her emotional and financial needs, Debra Canady decided to temporarily surrender her children to the Associated Catholic Charities in New Orleans, Louisiana in May of 1979. On June 4, 1979, Debra Canady made a voluntary, temporary transfer of custody of all three children to the Department of Health and Human Resources. However, there was no adjudication of the children made by the Orleans Parish Juvenile Court. Ms. Valerie Bernados, Administrator of the foster home program for Catholic Charities, testified at trial that Ms. Canady kept in contact with her and the children for a month after the voluntary surrender but then she had no communication with her until December of 1979. Ms. Canady called Ms. Bernados from Houston in December and asked about a Christmas visit with the children. Ms. Bernados stated that because of the length of time since her last contact, they would have to discuss her situation before they could set up a visit. She suggested Ms. Canady contact the Welfare Department in Houston for them to evaluate her situation. Ms. Canady testified she did not then contact the Department in Houston nor call back because she "panicked", felt guilty, ashamed, and was completely lacking in self-confidence. Ms. Bernados did affirm that Ms. Canady at no point indicated she intended to permanently surrender the children to the State. She told Ms. Bernados when she placed the children she was ill, had financial problems, and wanted to temporarily provide a good home for them.
Ms. Frances Sanders with the Office of Human Development, was a "parent worker" for Debra Canady. Her first contact with Ms. Canady was in October of 1981 when she contacted Ms. Canady to discuss the status of the children. No one had heard from Ms. Canady since December of 1979. Ms. Canady came into town and spoke with Ms. Sanders who informed her the Department had decided to work with her to reunite her with her children. Ms. Canady wanted her children back but Ms. Sanders informed her she would have to come back at a later date to sign a contract with the Department. Ms. Sanders stated although Ms. Canady wanted her children back at the October meeting and was willing to sign the contract then, she was not allowed to because it was Ms. Sanders' first contact with her and they did not usually enter into a contract of that nature and importance at a first contact. She stated because she was a new worker assigned to her she had to start her own working relationship with Ms. Canady regardless of the ongoing file on this case. Ms. Sanders told Ms. Canady to keep in contact with the agency, enter into a contract with them, and only then begin working towards visitation with the children. She stated the agency felt the children had not been prepared to visit with their mother because of the long time span between visits. Ms. Canady testified she agreed to have a psychological evaluation subsequent to her meeting with Ms. Sanders. She also stated she was told visitation would be set up either once a month or every six weeks and she could not give her children any gifts which she had for them. Ms. Canady testified at trial:
"They told me that their advice was to get a full-time job, a place that I could show to bring them. I have been working desperately doing this. I can prove insurance. I can prove the savings account. I have worked very, very hard."
Therefore, although Ms. Canady did not contact the agency for a long period of time, she was actively involved in fulfilling *267 their requirements to gain custody of her children. At every contact she did have with the agency she reiterated the fact she wanted to have her children back. Ms. Sanders affirmed that Ms. Canady stated to her she wanted her children back that day in October. Also, Gerald Canady's mother testified she spoke with Jimmy, Ms. Canady's son from a prior marriage, and Jimmy told her Ms. Canady stated he and the girls would all be together within a year. Therefore, this substantiates Ms. Canady's testimony that she was working towards a reunion with her children.
Mr. Canady had been granted visitation rights with his children in the custody decree following the divorce. However, when Ms. Canady left the state and moved to Houston, he assumed the children were with her. When he discovered they were not with her, he launched an investigation to determine their whereabouts. When he discovered they were in the custody of the State, he contacted Ms. Beverly Murphy of the Office of Human Development in February of 1981 to arrange visits with his daughters. Ms. Murphy went to Mr. Canady's mother's home with whom he was living on March 26, 1981 and had a long interview to evaluate his ability "to parent the girls". Mr. Canady called Ms. Murphy on June 22, 1981 and she made another home visit on that same date. She made yet another home visit the following day and Mr. Canady went to her office to see her on June 24 and 26. On that date, he signed a voluntary, permanent surrender of the youngest child. He again went to her office on June 30, 1981 and called Ms. Murphy on July 1, 1981. He again went to her office on July 30, 1981 at which time Ms. Murphy suggested he get a psychological evaluation. He agreed to this on August 4, 1981 at which time he signed a contract agreeing to make contributions towards the girls' support. Mr. Canady did have a psychological evaluation but he failed to make the $100 a month contribution to which he agreed. He was only allowed to visit the girls twice in all this time. He was told he would have to set up a regular visiting schedule but he informed Ms. Murphy he would not be able to do so because he worked shifts. Therefore, he was not allowed any type of regular visitation with his children. In November of 1981 the case was transferred to another worker. In fact, Mr. Canady had several workers who were assigned this case. He indicated at trial his experience with the agency was frustrating at best. He stated at trial he didn't care whether Debra or himself got custody but:
"I didn't feel like with two natural parents that the kids belonged in a foster home and I explained this to Mr. Campbell. I explained this to Ms. Murphy and I explained it to Colby and I never got any response. All they ever asked to do was enter the contract and that's it."
The State claims the children were abandoned according to the statutory authority set out in La.R.S. 9:403 as follows in pertinent part:
A. A child shall be considered abandoned when clear and convincing evidence is introduced at a judicial proceeding to prove either:
(1)(a) the child has been deserted for a period of at least four months by his parent or parents, the whereabouts of his parent or parents are unknown, the parent or parents have made no provision for the child's care and support and have shown an intention to avoid parental responsibility; or
(b) the parent or parents have failed to provide for the care and support of the child for a period of at least four months under circumstances showing an intention to permanently avoid parental responsibility.
(2) The introduction of clear and convincing evidence which establishes the facts required by Subparagraphs (1)(a) or (1)(b) of this Subsection shall create a presumption that the parent or parents intended to permanently avoid parental responsibilities. The child shall be declared abandoned unless the parent or parents present evidence that rebuts the presumption. A parent adjudged to have abandoned his child under Subparagraphs *268 (1)(a) or (1)(b) shall thereafter have no right to object to or oppose any proceeding to adopt that child.
This Part shall not be construed to require physical care of a child by a parent or parents to whom custody has been denied or from whom custody has been removed by a court of competent jurisdiction.
For purposes of this Subsection, custody shall be deemed to have been removed or denied to a parent only when such denial or removal is incidental to an action for divorce or separation from bed and board.
The State contends Section (A)(1)(b) of the above statute is applicable in that the parents failed to provide the care and support of the children for at least four months under circumstances showing an intention to permanently avoid parental responsibility. The State argues that when parents withdraw from the lives of their children for extended periods of time, a reasonable inference may be drawn they intend to permanently avoid parental responsibility. However, this is not true when the contrary is specifically stated. Mr. Canady made repeated efforts to gain visitation rights with his children and was thwarted at every step. Ms. Canady, although not contacting the agency for a substantial period of time, had stated initially she intended the placement to be only temporary and was desperately trying to get her life in order so that she would be a suitable mother for her children.
The trial court stated in its reasons for judgment a decree of abandonment which irrevocably breaks one of the closest and most fundamental human relationships must be based on evidence of circumstances clearly manifesting the parents' intention to permanently avoid all parental responsibility. Because of the harsh and incommutable consequences, all reasonable doubt should be resolved against entering such a decree. State, In Interest of McGruder 386 So.2d 155 (La.App. 3d Cir.1980). Also, Louisiana jurisprudence has established the rule that when a child has only been temporarily surrendered to the State, the State may not arbitrarily impose conditions on the return of the child. In Dillon v. State, 336 So.2d 1066 (La.App. 2d Cir.1976), the issue addressed was whether parents have the burden to prove their fitness in order to reacquire custody of their children voluntarily surrendered to the State while the parents were in hardship circumstances. The court in Dillon stated "the central issue in this appeal is under what circumstances the State can retain the custody of minor children against the wishes of the parents." The court in Dillon found the State had not obtained custody of the children through any judicial determination that the interest of the children required continued State intervention as provided by statute. Therefore, the court ordered custody of the children returned to the grandparents, who, in the Dillon case, had been granted custody by authentic act by the parents. The State attempts to distinguish the Dillon case from the instant one by stating the Dillon case is one for custody because the grandparents brought the custody suit whereas in the instant case the State brought the abandonment suit. However, such an interpretation would result in the proverbial "race to the courthouse." Whether the State filed a petition for abandonment or the parents filed a suit for custody first should not determine the rights of the parents to their children or the rights of the State to put conditions on such custody. The fact remains Ms. Canady requested the "physical" return of her children prior to filing the petition of abandonment by the State. The State refused to return the children until Ms. Canady complied with a number of demands. The State argues the judgment of the trial court effectively provides that when a parent temporarily places a child with the Department of Health and Human Resources no abandonment proceedings can ever be instituted against them regardless of the circumstances. However, this is not the case. If it became evident the parents did indeed intend to permanently avoid parental responsibilities, then abandonment proceedings could be brought. However, in the instant case, Mr. Canady made repeated efforts to gain visitation with his children *269 and Ms. Canady was working towards the agency's requirements for regaining the custody of her children. Thus, at no time did either parent evidence the requisite intent to permanently avoid parental responsibility.
For the reasons assigned, we affirm the judgment of the trial court and assess all costs of this appeal to appellant.
AFFIRMED.